**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: | )   <u>UNDER SEAL</u> |
| | ) |
| **MICROSOFT CORPORATION FOR** | )   CASE NO. 3:17MJ392 |
| **INFORMATION ASSOCIATED WITH** | ) |
| **MICROSOFT E-MAIL ACCOUNTS** | ) |
| **CJ@EARTHWATER.COM AND** | ) |
| **BB@EARTHWATER.COM** | ) |
| | )   CASE NO. _____ |
| **GOOGLE, INC. FOR INFORMATION** | ) |
| **ASSOCIATED WITH GOOGLE, INC. E-** | ) |
| **MAIL ACCOUNTS** | ) |
| **CJCOMU@GMAIL.COM AND** | ) |
| **EARTHWATER.DAN@GMAIL.COM** | ) |

<u>**AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANTS**</u>

I, Mark A. Heath, being first duly sworn state the following:

<u>**INTRODUCTION**</u>

1.     This affidavit is made in support of applications for search and seizure warrants to obtain information associated with the following e-mail accounts (the TARGET E-MAIL ACCOUNTS):

       a.   cj@earthwater.com (TARGET E-MAIL ACCOUNT 1);

       b.   cjcomu@gmail.com (TARGET E-MAIL ACCOUNT 2);

       c.   bb@earthwater.com (TARGET E-MAIL ACCOUNT 3); and

       d.   earthwater.dan@gmail.com (TARGET E-MAIL ACCOUNT 4).

2.     Open source research using mxtoolbox.com indicates that the mail exchange associated with the domain earthwater.com resides on servers owned by Microsoft Corporation (MICROSOFT). This was further confirmed by a representative of GoDaddy, LLC, which hosts the domain earthwater.com. TARGET E-MAIL ACCOUNTS 1 & 3 are

1

therefore stored at premises controlled by MICROSOFT, an e-mail provider headquartered at One Microsoft Way, Redmond, WA 98052-6399, as described in Attachment A-1.

3.     TARGET E-MAIL ACCOUNT 2 & 4 are stored at premises controlled by Google, Inc. (GOOGLE), an e-mail provider headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043, as described in Attachment A-2.

4.     This affidavit is made in support of applications for search and seizure warrants under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require MICROSOFT and GOOGLE (together, the TARGET E-MAIL PROVIDERS) to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

5.     Based on the facts set forth in this affidavit, there is probable cause to believe that the users of the TARGET E-MAIL ACOUNTS are engaged in, or associated with, a fraudulent investment scheme in violation of Title 18 United States Code (U.S.C.) § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and/or 18 U.S.C. § 1349 (conspiracy).  There is also probable cause to search information (including communications) associated with each of the TARGET E-MAIL ACCOUNTS, as described in Attachments A-1 and A-2 for evidence, fruits, and/or instrumentalities of those crimes, as further described in Attachment B.

**AFFIANT'S BACKGROUND**

6.     I am a Postal Inspector employed by the U.S. Postal Inspection Service.  I have been a Postal Inspector since August 2001.  As part of my current duties, I investigate

2

instances of fraud including, but not limited to, those involving the use of the United States Postal Service. I received my basic training as a criminal investigator at the U.S. Postal Service Academy in Potomac, Maryland. Over the years, I have received training in the areas of financial fraud, computer forensics, and white collar crime. I have been the case agent in numerous criminal investigations. I have authorized and sworn to numerous affidavits in support of federal search warrants, federal arrest warrants, and federal warrants for seizure of property subject to forfeiture. I have personally participated in executing search warrants and seizing evidence, including computers and other electronic equipment, from both businesses and personal residences. As a Postal Inspector, I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations and to make arrests for federal felony violations.

7.     The facts set forth in this affidavit are based upon my personal knowledge and knowledge obtained during my participation in this investigation, including my review of documents related to this investigation, communication with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. This affidavit does not contain all of the information known to me regarding this investigation. I have included in this affidavit facts that I believe are sufficient to support a probable cause finding for the issuance of the requested warrant, but I do not purport to include each and every fact observed or known to me or other law enforcement agents involved in this investigation.

3

## JURISDICTION

8. The Court has jurisdiction to issue the requested warrants because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. *See* 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

9. Based on my review of financial records produced in response to grand jury subpoenas, at least one victim resides in the Western District of North Carolina. That victim, JRL, is a resident of Dallas, North Carolina, which is within the Western District of North Carolina. In addition, the bank on which their checks were drawn, Park Sterling Bank, is headquartered in Charlotte, North Carolina.

## PROBABLE CAUSE

10. I am familiar with the October 18, 2017 Second Superseding Indictment, attached hereto as **Exhibit A**, filed in this Court, wherein Daniel Thomas BROYLES, Sr., Nicholas FLEMING (a/k/a Nick Franklin), and Scott DEARBORN, among others, were charged for their roles in a high-yield investment fraud scheme that began, at the latest, in January 2012. As set forth in the Second Superseding Indictment, BROYLES, FLEMING and others targeted victims by telephone and e-mail to induce those victims to purchase stock in Niyato Industries, Inc. ("Niyato"), a company that claimed, among other things, to manufacture electric and compressed natural gas (CNG) automobiles. BROYLES recruited FLEMING to join the Niyato scheme and, in turn, FLEMING recruited others, including DEARBORN.

11. As further described in the Second Superseding Indictment and established by my investigation of Niyato's stock sales, BROYLES, FLEMING, DEARBORN and others

4

specifically encouraged investments in Niyato stock on the basis of false statements and promises regarding Niyato's operations, management, production, profits, and imminent plans for an initial public offering (IPO) of stock. In truth, as the Second Superseding Indictment details, BROYLES, FLEMING, DEARBORN and the others with whom they conspired to sell Niyato stock knew that Niyato had no facilities, had not manufactured an electric or CNG vehicle, lacked claimed management figures or profits, and was not planning an imminent IPO.

12. In addition, investors were told that 2.9 percent of investor funds would be used for expenses associated with the offering. In truth, as the Second Superseding Indictment details, up to fifty percent of investor funds were paid to BROYLES, FLEMING, DEARBORN and others who promoted Niyato stock. In the case of BROYLES and FLEMING, BROYLES received a five percent commission on all sales made by FLEMING because BROYLES recruited FLEMING to join the Niyato scheme. FLEMING received forty-five percent commission on sales made by FLEMING's recruits. FLEMING split his commissions with DEARBORN, who was his business partner.

13. BROYLES evaded arrest by fleeing to Mexico shortly after I began my investigation into the sale of Niyato stock and this Court ordered the seizure of Niyato's J.P. Morgan Chase bank account ending in x9352 in July 2016.

14. On October 17, 2017, FLEMING pled guilty to one count of conspiracy in violation of 18 U.S.C. § 1349 and one count of wire fraud in violation of 18 U.S.C. § 1343.

15. I met with FLEMING to interview him on two separate occasions: August 24, 2017 and October 17, 2017. FLEMING told me that, in the summer of 2016, BROYLES recruited FLEMING to join him in a separate and new scheme to sell shares of a company

5

known as Earthwater, Inc. ("Earthwater" or the "Company"), which manufactures and sells mineral-infused bottled water. BROYLES introduced FLEMING to CJ COMU, the Company's Chief Executive Officer, and Harley "Buddy" BARNES, III, its Chief Financial Officer. As described below in greater detail, FLEMING advised that COMU is the user of TARGET EMAIL ACCOUNTS 1 and 2; BARNES is the user of TARGET EMAIL ACCOUNT 3; and BROYLES is the user of TARGET EMAIL ACCOUNT 4. FLEMING further advised that he had email communication concerning Earthwater with each target using their respective TARGET EMAIL ACCOUNTS.

16.     FLEMING told me that, like Niyato, Earthwater paid him excessive commissions. FLEMING explained that the private placement memorandum ("PPM") represented to prospective investors that brokers would not be paid more than ten percent commission for selling Earthwater stock and that the remainder would be reinvested in the Company. Based on my review of several versions of the PPM, the document corroborates FLEMING's statement. For example, in the version of the PPM dated February 1, 2016, Earthwater told prospective investors that "fees paid to a Broker/Dealer with respect to sales of the Shares...shall not exceed ten percent (10%) of the purchase price of the Shares."

17.     FLEMING further explained that, in truth, Earthwater paid fifty percent of each victim's funds to BROYLES and FLEMING. Before BROYLES fled, BROYLES received ten percent of each victim's funds and FLEMING received forty percent. After BROYLES fled, FLEMING negotiated a new arrangement with COMU whereby BROYLES would purportedly receive five percent of each victim's funds and FLEMING would receive forty-five percent. COMU told FLEMING that he wanted to save the five

percent for BROYLES because BROYLES was facing legal problems and would need the money. FLEMING does not know whether COMU actually ever sent to BROYLES the cut COMU purported to set aside for him.

18.    FLEMING explained that either COMU or BARNES had instructed FLEMING to submit an invoice to BARNES with the amount of commission FLEMING was due on each sale that FLEMING or his recruits made. FLEMING further explained that he did, in fact, prepare invoices on a regular basis and that he sent the invoices to BARNES via email at TARGET E-MAIL ACCOUNT 3. FLEMING provided me a copy of the invoices, which identify the victim to whom FLEMING or his team had sold Earthwater stock and the amount of commission due. FLEMING stated that he sent these invoices to BARNES at TARGET E-MAIL ACCOUNT NUMBER 3.

19.    As discussed below in paragraph 27(d) below, review of email correspondence between BROYLES and COMU as well as information provided by FLEMING, revealed that Earthwater maintained a bank account at Bank of America ending in x2037.    Bank of America produced records of that account pursuant to a subpoena. Those records confirmed that Earthwater did, in fact, pay invoices sent by FLEMING to BARNES.

20.    FLEMING admitted to me that he knew the PPM misrepresented the amount of commission Earthwater paid to brokers like him and that the excessive amount of commission BROYLES and FLEMING received was a red flag indicating that COMU and BARNES were defrauding investors.

21.    FLEMING also told me that he promoted Earthwater stock until April 2017, when he was arrested on the fraud and conspiracy charges set forth in the Second Superseding Indictment. Based on my review of financial records for Earthwater's Bank of America

7

account ending in x2037, which Bank of America produced pursuant to a subpoena, Earthwater has continued to receive investor funds and pay out corresponding commissions of up to fifty percent (50%) through at least August 2017. The relationship between the investor funds and the commissions is typically indicated in the wire transfers or the checks received and paid out of the account. For example, the commission checks paid for the stock purchases by JRL, who is a resident of Dallas, North Carolina in the Western District of North Carolina, has the victim's last name written in the memo line.

22.     In addition to Earthwater, COMU had business dealings with Niyato. In 2006, COMU was sued for common law fraud and securities fraud. When, in 2009, COMU failed to appear for trial, the court entered a default judgment for over $3 million. Shortly thereafter, COMU filed for bankruptcy. In 2010, COMU sought and was granted a discharge. Later that year, the plaintiffs who obtained the default judgment against COMU commenced an action for fraudulent discharge. The bankruptcy court ultimately found in favor of plaintiffs, concluding that COMU intentionally defrauded his creditors by concealing certain assets.

23.     Based on my review of the bankruptcy court's findings of fact and conclusions of law in that case, COMU played a key role in a reverse merger transaction that resulted in the formation of a publicly-traded company named Green Automotive Company Corporation ("Green Auto"). *See In re Comu*, No. 09-38820-SGJ-7, 2014 WL 3339593 (Bankr. N.D. Tex. July 8, 2014), *aff'd, appeal dismissed sub nom. Comu v. King Louie Min., LLC*, 534 B.R. 689 (N.D. Tex. 2015), and *aff'd sub nom. Matter of Comu*, 653 F. App'x 815 (5th Cir. 2016). According to the bankruptcy court's findings, COMU was personally involved in drafting the reverse merger documents and, following the reverse

merger, acquired a substantial stake in Green Auto and solicited investors for Green Auto stock. The bankruptcy court held that COMU intentionally defrauded his creditors by concealing his pre-petition interest in Green Auto.

24. Based on my review of documents obtained in connection with my investigation of the Niyato scheme and publicly-available press releases, in 2011, Green Auto entered into a letter of intent with Niyato to partner in bringing domestically-manufactured electric vehicles to the U.S. market. Both companies used the purported partnership to promote their respective stock, including in press releases issued in January 2012.

25. TARGET E-MAIL ACCOUNT 1 is an email account used by COMU to coordinate fraudulent sales pitches and commission payments relating to the sale of Earthwater stock. FLEMING told me that COMU regularly used TARGET E-MAIL ACCOUNT 1 to send and receive emails to and from FLEMING about Earthwater. FLEMING provided me with several emails between FLEMING and COMU that corroborate FLEMING's statements that he communicated with COMU about promoting Earthwater stock using TARGET E-MAIL ACCOUNT 1. For example:

   a. On September 1, 2016, FLEMING sent an email to COMU at TARGET E-MAIL ACCOUNT 1 requesting immediate payment of commission due on a sale made to a victim. In the email, FLEMING wrote to COMU: "Please have someone advise me if you are able to have the deposit made **today** *(it would be **most** appreciated, as I want to take care of someone before the weekend)*. Once I can confirm it, I will advance the fees owed to the respective party to show good faith. Call me anytime with questions or comments. Thanks!" (emphasis in original).

9

b. On December 5, 2016, FLEMING sent an e-mail to COMU at TARGET E-MAIL ACCOUNT 1 with the subject line "Stock Cert Question". In his email, FLEMING told COMU that "We have a client named **Frank Pounders** that purchased 10,000 shares the first week of October that is telling us he never got his stock certificate. I just emailed this inquiry to Buddy.... is there anyone else that i should be communicating with in the EW Office for these kind of issues ? Thanks." On December 7, 2016, after COMU had not responded, FLEMING forwarded the e-mail to COMU at TARGET E-MAIL ACCOUNT 1. On December 8, 2017, COMU forwarded the email from TARGET E-MAIL ACCOUNT 1 to BARNES at TARGET E-MAIL ACCOUNT 3. BARNES sent an e-mail from TARGET E-MAIL ACCOUNT 3 to FLEMING confirming delivery of the stock certificate to the victim, and copied COMU at TARGET E-MAIL ACCOUNT 1.

c. On February 3, 2017, COMU sent an e-mail from TARGET E-MAIL ACCOUNT 1 to FLEMING with the subject line "RE: EarthWater & Super Bowl 2017." The e-mail discusses and forwards link to a press release about Earthwater. FLEMING offered comments on the wording of the press release. COMU responded by writing "Dammmmmmmmmmmmnthanks Big Daddy. All good our end - get set for mega month!!!!!!" Based on my review of financial records for the bank account that Earthwater used to receive victim funds and pay commission, in February 2017, FLEMING's

10

team sold fifty thousand shares of Earthwater stock for a total of $25,000, and made at least $11,250 in commissions.

    d.   On March 7, 2017, COMU forwarded an email titled "UAE Opportunities" from TARGET E-MAIL ACCOUNT 1 to FLEMING and "123edgoss@gmail.com," with information about parties interested in distributing Earthwater products in the United Arab Emirates.

26.    In addition, COMU used TARGET E-MAIL ACCOUNT 1 to send and receive emails to and from BROYLES about Earthwater. On July 14, 2016, this Court issued a search warrant for BROYLES's e-mail account danbroyles3@gmail.com based on BROYLES's use of that account to distribute false sales information to victims and to coordinate fraudulent sales pitches and commission payments with regard to Niyato and other fraudulent schemes. The affidavit supporting that warrant is attached hereto as **Exhibit B.** BROYLES exchanged emails with COMU at TARGET E-MAIL ACCOUNT 1 that discuss promoting Earthwater stock.

    a.   On July 6, 2016, COMU sent an e-mail from TARGET E-MAIL ACCOUNT 1 to BROYLES with a press release announcing that Earthwater had retained a "top" New York law firm to advise the Company about going public. In my experience, promoters in high-yield investment frauds typically induce victims to purchase unregistered stock in a company by representing that the company is about to go public and that when it does, the victim's investment will be worth substantially more money and will be liquid because the shares can be sold on a national securities exchange, like NASDAQ or the NYSE. Moreover, as FLEMING stated in his interview,

11

promoters also create a sense of urgency by claiming that the investment opportunity is about to close. As of the date of this affidavit, Earthwater has not commenced an initial public offering and the Company continues to sell stock.

b. On July 7, 2016, BROYLES emailed COMU at TARGET E-MAIL ACCOUNT 1 to provide COMU with a new email address that BROYLES created exclusively for use when promoting Earthwater stock (that email address, earthwater.dan@gmail.com, is TARGET E-MAIL ACCOUNT 4). In his email, BROYLES also requested that COMU send him the PPM and sign him up for news feeds about Earthwater. COMU replied using TARGET E-MAIL ACCOUNT 1 to say "Sent you 4 Emails!!" at TARGET E-MAIL ACCOUNT 4.

27. TARGET E-MAIL ACCOUNT 2 is another email account COMU used to communicate about fraudulently promoting Earthwater stock. Based on my review of emails obtained pursuant to the July 14, 2016 search warrant for BROYLES's e-mail account – danbroyles3@gmail.com – BROYLES sent and received email about promoting Earthwater to and from COMU at TARGET EMAIL ACCOUNT 2. For example:

a. On May 26, 2016, COMU sent an email from TARGET E-MAIL ACCOUNT 2 to BROYLES with the subject "To Dan – Earthwater Info". In his email to BROYLES, COMU wrote "Please review info on one of the greatest new beverage company's [sic] in the world – **Earthwater**." COMU included a link to a "Two Minute Investor Video" as well as links to the Company's websites, corporate and product videos on YouTube, and

12

a news article about the beverage industry. COMU also attached a version of the PPM dated January 2016, an investor presentation, and an executive summary describing the investment opportunity. All three attachments represent that brokers will be paid no more than ten percent of the funds raised in connection with the offering.

b. Later on May 26, 2016, BROYLES responded to COMU at TARGET E-MAIL ACCOUNT 2. BROYLES informed COMU that "I will be sharing your deal with my people.....so if they do the hot oil reach around redirect them to me....yes? and I need 90 days at 50 [sic] We will load our people and we have some hitters....though as you know it takes some massaging....time. OK?"

c. On May 26, 2016, COMU sent an email from TARGET E-MAIL ACCOUNT 2 agreeing to BROYLES's proposed arrangement for fifty percent commission: "You (m-a-y) get the Hawaii 5-0 if you get rolling quick – we can continue. Get started – my gift to you......"

d. On July 6, 2016, COMU sent an email from TARGET E-MAIL ACCOUNT 2 to BROYLES attaching a copy of the stock purchase agreement that COMU wanted BROYLES to ask victims to sign as well as instructions for how victims can send their money to Earthwater. Specifically, the instructions directed victims to send money to Earthwater's Bank of America ending in x2037.

e. On July 6, 2016, BROYLES sent COMU an email at TARGET E-MAIL ACCOUNT 2 with the subject line "names". In his email, BROYLES

13

provided "the names of [BROYLES's] future EW [Earthwater] sales people". The list included Nick Fleming. BROYLES added that "If someone new contacts you chances are they are from me and please re-direct to me …. tx."

    f.   On July 7, 2016, BROYLES exchanged emails with COMU at TARGET E-MAIL ACCOUNT 2 with the subject line "team call – Today @9am PST". BROYLES provided COMU with dial-in information for a call to introduce his sales people to COMU. COMU asked "how many 'playahs' on the call". BROYLES responded "only me and two others".

28.    TARGET E-MAIL ACCOUNT 3 is an email account BARNES used to conduct Earthwater business, including about the receipt of victim funds and payment of commissions. Based on my review of financial records for Earthwater's Bank of America account ending in x2037, which Bank of America produced pursuant to a subpoena, BARNES is a signatory on the account and Earthwater used the account to receive victim funds and pay commissions. TARGET E-MAIL ACCOUNT 3 is listed as the email address associated with that account. In addition, when I interviewed FLEMING, he told me that he regularly sent invoices for excessive commissions to BARNES at TARGET E-MAIL ACCOUNT 3 and otherwise communicated with BARNES at TARGET E-MAIL ACCOUNT 3 about a number of issues related to Earthwater. FLEMING provided several emails to me that corroborated his statements. For example:

    a.   On September 16, 2016, FLEMING sent an email to BARNES at TARGET E-MAIL ACCOUNT 3 listing the names of three victims that FLEMING's group had defrauded and the amount of money they were sending to

14

Earthwater. On September 20, 2016, BARNES emailed from TARGET E-MAIL ACCOUNT 3 to confirm receipt of funds from two of the three victims.

b. On September 29, 2016, FLEMING followed up with BARNES at TARGET E-MAIL ACCOUNT 3 on the September 20, 2016 email described immediately above. FLEMING wrote that "CJ told me he would pay on what came in as of Wed, the 21st tomorrow (Friday the 30th), and pay on the transactions for friday, the 23rd, next Monday (the 3rd).. [sic] Also, I am in the middle of starting a new Corp and it may take a week or so to get a bank acccount [sic] set up for that. In the meantime, CJ said you could pay me direct (as an individual), so I will send you 2 invoices for the 2 payments referenced above in a separate email, (with my bank info for that). Please confirm that all the above works for you... Thanks!" Later that same day, BARNES responded from TARGET E-MAIL ACCOUNT 3, confirming the arrangement whereby Earthwater agreed to pay FLEMING forty-five percent of each victim's funds and confirming that BARNES would pay FLEMING the amount due: "OK, please send an invoice (45% of $20K) to be paid 09.30.16 and an invoice (45% of $10K) to be paid 10.03.16. We can deposit funds directly into a Bank of America account or Wells Fargo account." Based on my review of financial records for Earthwater's Bank of America account ending in x2037, which Bank of America produced pursuant to a subpoena, Barnes paid FLEMING the agreed upon forty-five percent commission using two checks made out to

15

FLEMING. This amount was thirty-five percent in excess of the ten percent commission that Earthwater told investors it would pay to brokers in connection with the offering.

c. On October 13, 2016, FLEMING sent an email to BARNES at TARGET E-MAIL ACCOUNT 3 to point out a typographical error in the PPM. FLEMING commented that "most people don't notice (or don't say anything), but we've had a couple people comment that it seems a bit 'amaturish' [sic] that our legal doc isn't perfect...." Later that day, BARNES responded from TARGET E-MAIL ACCOUNT 3, to thank FLEMING and tell FLEMING that BARNES would fix it.

d. As described above, on December 5, 2016, FLEMING sent an email to COMU at TARGET E-MAIL ACCOUNT 1 to ask who he should contact about a question as to whether a stock certificate had been sent to a particular victim. On December 8, 2016, COMU forwarded FLEMING's email to BARNES at TARGET E-MAIL ACCOUNT 3 and later that day, BARNES responded from TARGET E-MAIL ACCOUNT 3 to confirm that the stock certificate had, in fact, been sent.

e. On January 21, 2017, BARNES received an email at TARGET E-MAIL ACCOUNT 3 titled "New Invoice" from FLEMING. The attached invoice was dated January 20 and marked as due January 23. It referenced "consulting and referral services" relating to an investor, listed the investor's name, and indicated a commission due of $11,250. An analysis of Earthwater bank records indicated the investor's stock purchase at that

time was $25,000, meaning the commission totaled 45 percent of the purchase price.

f. On January 23, 2017, BARNES sent an email from TARGET E-MAIL ACCOUNT 3 to FLEMING confirming the transfer of funds for the invoice containing the forty-five percent commission, at no time indicating any concern over the excessive commission charge.

29. TARGET E-MAIL ACCOUNT 4 is an email account used by BROYLES in communicating with COMU, BARNES, FLEMING, and other co-conspirators regarding Earthwater and the sale of Earthwater stock. Emails from the initial search warrant production showed BROYLES communicating with COMU about stock sales and commissions in coded language, and the emails in TARGET E-MAIL ACCOUNT 4 look to be no different. Examples of the use of TARGET E-MAIL ACCOUNT 4 to communicate with COMU, BARNES, FLEMING, and other co-conspirators include:

a. As stated above, on July 7, 2016, BROYLES emailed COMU at TARGET E-MAIL ACCOUNT 1 to provide COMU with a new email address that BROYLES created exclusively for use when promoting Earthwater stock (earthwater.dan@gmail.com – TARGET E-MAIL ACCOUNT 4). In his email, BROYLES also requests that COMU send him the PPM and sign him up for news feeds about Earthwater. COMU replies using TARGET E-MAIL ACCOUNT 1 to say "Sent you 4 Emails!!" at both Broyles' "danbroyles3@gmail.com" address and TARGET E-MAIL ACCOUNT 4;

b. On August 6, 2016, BROYLES sent an email from TARGET E-MAIL ACCOUNT 4 to FLEMING and another email recipient pointing out a

17

factual error in Earthwater promotional material, wherein the phrase "FDA Approved" had been added. The material also suggests "25 years of research and development," for a product the PPM says had not been conceived of until December of 2012, and misspelled the name of an Advisory Board Member. The email appears to be signed "Dan Thomas," which is likely an alias used by Broyles in the scheme.

c. On August 11, 2016, FLEMING emailed BROYLES at TARGET E-MAIL ACCOUNT 4, stating "of all the challanges (sic) to bringing in investor funding, **trying the product** is the most important and <u>our BIGGEST Obstacle</u> right now," and requesting that BROYLES convey to COMU "the importance of getting the 'free shipping' back up."

d. Similarly, on August 19, 2016, FLEMING emailed BROYLES at TARGET E-MAIL ACCOUNT 4 with a series of questions regarding Earthwater stock, including: "what is the total issued and outstand stock count right now? (including principals and the first 2 money raises;" "Who is it that is suing the BLK brand?...and how did CJ get into the game;" and "When can we expect to see Fulhum in west coast stores."

e. A week later, on August 26, 2016, FLEMING reached out to BROYLES at TARGET E-MAIL ACCOUNT 4 with a different question, this time about a victim who they had induced to buy the stock of Earthwater and Niyato: "Hey Buddy... the client W - also invested into Niyato and wanted an update..." (name withheld).

30.    Based on the aforementioned facts, I submit that there is probable cause to believe that COMU, BARNES, BROYLES, and their co-conspirators are engaging in a fraudulent scheme to sell victims Earthwater stock based on false representations and pretenses in violation of 18 U.S.C. § 1341 and 18 U.S.C § 1343. I further submit that there is probable cause to believe that COMU, BARNES, BROYLES and their above-identified co-conspirators used the TARGET E-MAIL ACCOUNTS, as described in Attachments A-1 and A-2, as instrumentalities of their crimes, and that the TARGET E-MAIL ACCOUNTS contain evidence and fruits of their crimes that justify the issuance of this warrant to allow examination of the information identified in Attachment B as part of an ongoing investigation in a manner consistent with the Fourth Amendment and other laws.

## BACKGROUND CONCERNING E-MAIL

31.    In my training and experience, I have learned that the TARGET E-MAIL PROVIDERS offer a variety of services to the public, including e-mail access and electronic data storage. The TARGET E-MAIL PROVIDERS allow subscribers to obtain e-mail accounts using various domain names (e.g., gmail.com, me.com), including those e-mail accounts listed in Attachments A-1 and A-2. Subscribers obtain an e-mail account by registering for e-mail services offered by the TARGET E-MAIL PROVIDERS. During the registration process, the TARGET E-MAIL PROVIDERS ask subscribers to provide basic personal information. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including a credit- or bank-account number). The computers of the TARGET E-MAIL PROVIDERS are likely to contain stored electronic communications (including retrieved and un-retrieved e-mails for

19

subscribers) and information concerning subscribers and their use of e-mail services, such as account access information, e-mail transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user(s).

32.    Subscribers of the TARGET E-MAIL PROVIDERS can also store with the providers files in addition to e-mails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to e-mails), draft messages, deleted items, and other files, on servers maintained and/or owned by the TARGET E-MAIL PROVIDERS. In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, draft e-mail messages, deleted messages, e-mail in the account, and attachments to e-mails, including pictures and files.

33.    In my training and experience, the TARGET E-MAIL PROVIDERS typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, the TARGET E-MAIL PROVIDERS often have records of the Internet Protocol address (IP address) used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP

address information can help to identify which computers or other devices were used to access the e-mail account.

34.     In my training and experience, in some cases, e-mail account users will communicate directly with a TARGET E-MAIL PROVIDER about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. The TARGET E-MAIL PROVIDERS typically retain records about such communications, including records of contacts between a user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

## CONCLUSION

35.     Based on the foregoing information, I respectfully request that the Court issue the

proposed search warrant. Because the warrant will be served on the TARGET E-MAIL

PROVIDERS, which will then compile the requested records at a time convenient to them,

reasonable cause exists to permit the execution of the requested warrant at any time in the

day or night.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Mark A. Heath, U.S. Postal Inspector
United States Postal Inspection Service

Sworn and subscribed to before me on this **16** th day of November, 2017.

_____
Hon. David C. Keesler
United States Magistrate Judge

## ATTACHMENT A-1 -
## PLACE TO BE SEARCHED

The place to be searched is Microsoft Corporation, an e-mail provider headquartered at One Microsoft Way, Redmond, WA 98052-6399, for all information associated with the following e-mail accounts:

cj@earthwater.com
bb@earthwater.com

## ATTACHMENT A-2
## PLACE TO BE SEARCHED

The place to be searched is Google, Inc., an e-mail provider headquartered at 1600

Amphitheatre Parkway, Mountain View, CA 94043, for all information associated with the

following e-mail accounts:

cjcomu@gmail.com
earthwater.dan@gmail.com

# ATTACHMENT B -
## PARTICULAR ITEMS TO BE SEIZED

**I.    Information to be disclosed by Microsoft Corporation & Google Inc.**

To the extent that the information described in Attachments A-1 & A-2 is within the possession, custody, or control of Microsoft Corporation or Google, Inc. (both TARGET E-MAIL PROVIDERS), including any e-mails, records, files, logs, or information that has been deleted but is still available to the TARGET E-MAIL PROVIDER, or has been preserved pursuant to requests made under 18 U.S.C. § 2703(f) on August 31, 2017, and any other dates, the TARGET E-MAIL PROVIDER is required to disclose the following information to the government for each e-mail account listed in in Attachments A-1 & A-2:

a.    The contents of all e-mails, chat messages, instant messages, text messages, and voice messages associated with the account, including stored or preserved copies of e-mails and messages sent to and from the accounts, draft e-mails and messages, chat messages, the source and destination addresses associated with each e-mail or message, the date and time at which each e-mail or message was sent, and the size and length of each e-mail or message;

b.    All records or other information regarding the identification of the account holder or user(s), to include any full name(s), physical address(es), telephone number(s), alternative e-mail address(es), means and source of payment (including any credit- or bank-account number), and other identifiers.

c.    All records of account-access session times and durations, the date on which the account was created, the length of service, the IP address used to register the account,

log-in IP addresses associated with session times and dates, account status, methods of connecting, and log files;

      d.     The types of services utilized;

      e.     All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files; and

      f.     All records pertaining to communications between a TARGET E-MAIL PROVIDER and any person regarding the account, including contacts with support services and records of actions taken.

## II. Information to be seized by the government:

All information described above in Section I that constitutes evidence or instrumentalities of violations of 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and/or 18 U.S.C. § 1349 (conspiracy), those violations involving CJ COMU, Harley "Buddy" BARNES, Dan BROYLES, and other individuals, including, for each e-mail account listed in Attachments A-1 and A-2, information pertaining to the following matters during the period January 1, 2012 to the present:

      a.     Records relating to Earthwater, Inc., EWB International, Inc., or their affiliates, or the mailing addresses 16220 Midway Road Addison, TX 75001 or 15455 Dallas Parkway – 6th Floor Dallas, TX 75001;

      b.     Records relating to telemarketing, investment, or stock brokerage activity, including records concerning:

          i.     the acquisition, identification, or sharing of personal identifying information, including but not limited to names, social security numbers, dates of birth,

driver's license information, addresses, telephone numbers, e-mail addresses, employment information, financial account records, and credit reports, related to individuals identified for potential solicitation;

      ii.      the pitches, scripts, sale messages, promotional materials, or payment instructions devised for, or presented to, individuals for the purpose of inducing individuals to send money or other things of value for the purchase of stock or other securities, or the payment of a fee, fine, insurance cost, tax, or duty;

      iii.      any arrangements for commissions or other payments or transfers of goods or services made by one party to another in relation to Earthwater, Inc., EWB International, Inc., or their affiliates,;

      iv.      the use of voice over Internet protocol technology;

      v.      the establishment or operation of a call center, from which individuals are contacted for the purpose of inducing individuals to send money or other things of value for the purchase of stock or other securities, or the payment of a fee, fine, insurance cost, tax, or duty; and

      vi.      the contacting by phone, Internet, mail, or other means of individuals for the purpose of inducing individuals to send money or other things of value for the purchase of stock or other securities, or the payment of a fee, fine, insurance cost, tax, or duty;

      c.      Information relating to who created, used, or communicated with created voice over Internet protocol or other communication accounts, including records about their identities and whereabouts;

- 5 -

d.      Banking and financial records, including, but not limited to, records reflecting the location and account information for bank accounts associated with Earthwater, Inc., EWB International, COMU, BARNES, BROYLES, their co-conspirators, or the receipt of funds from individuals induced to send money or other things of value for the purchase of stock or other securities, or the payment of a fee, fine, insurance cost, tax, or duty;

e.      Records relating to the receipt, transfer, or other disposition of any criminal proceeds;

f.      Records and information relating to the identity and/or location of suspects and co-conspirators;

g.      Evidence indicating how and when the e-mail account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the e-mail account user;

h.      Evidence indicating the e-mail account user's state of mind as it relates to the crimes under investigation;

i.      Information relating to who created or used the e-mail account, including records that help reveal the whereabouts of such person(s);

j.      Any decryption key or password that could be used to conceal evidence relating to the crimes under investigation;

k.      The identity and whereabouts of the person(s) who communicated with the e-mail account about matters relating to the commission of the violations described in the affidavit.

l.　　Any and all items and/or records associated with any goods, services, or property purchased from a bank or other financial account associated with Earthwater, Inc., EWB International, or their affiliates, COMU, BARNES, BROYLES, their co-conspirators, or to the commission of the violations described in the affidavit; and

m.　　Any and all travel documents including but not limited to, passports (foreign or domestic), travel itineraries, airline tickets, hotel receipts, and car rentals.

# Exhibit A

**"UNDER SEAL"**

FILED
CHARLOTTE, NC

OCT 18 2017

US DISTRICT COURT
WESTERN DISTRICT OF NC

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| **UNITED STATES of AMERICA** | ) | DOCKET NO. 3:16-CR-221-MOC |
| | ) | **SECOND SUPERSEDING** |
| v. | ) | **BILL OF INDICTMENT** |
| | ) | |
| **(1) ROBERT LESLIE STENCIL,** | ) | Vio: 18 U.S.C. § 1349 |
| **(2) DANIEL THOMAS BROYLES, SR.,** | ) | 18 U.S.C. § 1341 |
| **(3) KRISTIAN F. SIERP,** | ) | 18 U.S.C. § 1343 |
| **(4) LUDMILA O. STENCIL,** | ) | 18 U.S.C. § 2326(2)(A) & (B) |
| **(5) MARTIN DELANIE LEWIS,** a/k/a | ) | 18 U.S.C. § 1957(a) |
| Louis Michaels, | ) | 18 U.S.C. § 1956(a)(2)(A) & (i)(1)(B) |
| **(6) NICHOLAS FLEMING,** a/k/a Nick | ) | 18 U.S.C. § 982 |
| Franklin, | ) | 28 U.S.C. § 2461(c) |
| **(7) MICHAEL ALLEN DUKE,** a/k/a | ) | 18 U.S.C. § 2 |
| Mike West, | ) | |
| **(8) PAULA SACCOMANNO,** | ) | |
| | ) | |
| **(9) DENNIS SWERDLEN,** | ) | |
| and | ) | |
| **(10) SCOTT DEARBORN** | ) | |
| Defendants. | ) | |
| | ) | |

**THE GRAND JURY CHARGES:**

At all times relevant to this Indictment:

Introduction

1.     Niyato Industries, Inc. ("Niyato") was a company incorporated in Nevada and

registered as an operating entity in Charlotte, North Carolina.  Niyato maintained a bank account

at J.P. Morgan Chase with account number ending in #9352.  Niyato's corporate address was a

private mail box in a commercial mail receiving agency at 1235-E East Boulevard, Suite 130,

Charlotte, North Carolina.

1

2. Defendant **ROBERT LESLIE STENCIL**, was a United States citizen residing in Charlotte, North Carolina. **ROBERT STENCIL** founded Niyato in 2010 and was the registered President and self-designated Chief Executive Officer of Niyato. **ROBERT STENCIL** is married to defendant Ludmila Stencil.

3. Defendant **DANIEL THOMAS BROYLES, SR.**, was a United States citizen residing in Malibu, California.

4. Defendant **KRISTIAN F. SIERP**, was a United States citizen residing in Costa Rica. **SIERP** owned and operated a telemarketing call center in Costa Rica.

5. Defendant **LUDMILA O. STENCIL**, the self-designated Secretary of Niyato, worked with her husband defendant Robert Stencil, in facilitating Niyato's operations and resided in Charlotte, North Carolina.

6. Defendant **MARTIN DELANIE LEWIS**, a/k/a Louis Michaels, d/b/a LM3 Consulting LLC, was a United States citizen residing in Frisco, Texas.

7. Defendant **NICHOLAS FLEMING**, a/k/a Nick Franklin, d/b/a Marketing Advisory Services LLC, was a United States citizen residing in Northridge, California.

8. Defendant **MICHAEL ALLEN DUKE**, a/k/a Mike West, d/b/a NWM LLC and Absolute Rarities LLC, was a United States citizen residing in Richardson, Texas.

9. Defendant **PAULA SACCOMANNO**, d/b/a Exclusive Marketing, was a United States citizen residing in Boca Raton, Florida.

10. Defendant **DENNIS SWERDLEN**, d/b/a Exclusive Marketing, was a United States citizen residing in Boca Raton, Florida.

11.    Defendant **SCOTT DEARBORN**, d/b/a Marketing Assistance Services Inc., was

a United States citizen residing in California.

## COUNT ONE
## (CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD - 18 U.S.C. SECTION 1349)

<u>The Conspiracy</u>

12.    From at least January 2012, the exact date being unknown to the Grand Jury,

through on or about August 18, 2016, in Charlotte, Mecklenburg County, within the Western

District of North Carolina, and elsewhere, the defendants

**ROBERT LESLIE STENCIL,**
**DANIEL THOMAS BROYLES, SR.,**
**KRISTIAN F. SIERP,**
**LUDMILA O. STENCIL,**
**MARTIN DELAINE LEWIS,**
**NICHOLAS FLEMING,**
**MICHAEL ALLEN DUKE,**
**PAULA SACCOMANNO,**
**DENNIS SWERDLEN,**
and
**SCOTT DEARBORN,**

together with other conspirators, both known and unknown to the Grand Jury, knowingly

combined, conspired, confederated, and agreed together, and with each other, to commit the

following offenses:

a.    To knowingly and willfully devise a scheme and artifice to defraud and to

obtain money and property by means of materially false and fraudulent pretenses,

representations, and promises, and for the purpose of executing and attempting to execute the

scheme and artifice to defraud did knowingly and willfully place and caused to be placed in a

post office and authorized depository for mail matter, and to be sent and delivered by the Postal

Service and by a private and commercial interstate carrier, mail matter, specifically victim

3

investments in Niyato Industries, Inc., in violation of Title 18, United States Code, Section 1341; and

> b.      To knowingly and willfully devise scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing and attempting to execute the scheme to defraud did knowingly and willfully transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds, specifically wire transfers of victim investment funds into and from the bank account of Niyato Industries, Inc., in violation of Title 18, United States Code, Section 1343.

Purpose of the Conspiracy

13.     The purpose of the conspiracy was to:  (a) make materially false and fraudulent representations to investors regarding the nature of Niyato's facilities, operations, management, expertise, achievements, and stock value to induce investors to purchase Niyato stock; and (b) enrich **ROBERT STENCIL, BROYLES, SIERP, LUDMILA STENCIL, LEWIS, FLEMING, DUKE, SACCOMANNO, SWERDLEN, DEARBORN,** and others, who used the proceeds of the stock sales for their personal benefit.

Manner and Means of the Conspiracy and the Scheme to Defraud

14.     It was part of the conspiracy and scheme to defraud, and among the manner and means by which the defendants and their co-conspirators carried out the conspiracy, that:

> a.      **ROBERT STENCIL, BROYLES, SIERP, LUDMILA STENCIL, LEWIS, FLEMING, DUKE, SACCOMANNO, SWERDLEN, DEARBORN,** and others

4

contacted targeted victims—at least ten of whom were over the age of 55—by telephone and email to induce those victims to purchase Niyato stock.

      b.     **LEWIS** used the alias "Louis Michaels" and the fabricated email account "lmicheals.niyato@gmail.com" to mask his true identity and background from victims.

      c.     **DUKE** used the alias "Mike West" and the fabricated email account "niyatoinfo@gmail.com" to mask his true identity and background from victims.

      d.     **FLEMING** used the alias "Nick Franklin" and the fabricated email accounts "niyato.billing@mail.com" and "nick.niyato@mail.com" to mask his true identity and background from victims.

      e.     **SIERP** used the aliases "Dave Anderson" and "Anderson Advisors" as well as the fabricated email account "andersonadvisors@yahoo.com" and "dave@diversified-equities.com" to mask his true identity and background from victims.

      f.     **SIERP** and co-conspirators working in his telemarketing call center in Costa Rica also used Voice over Internet Protocol (VoIP) in calling victims. The VoIP technology, which utilized computers to make telephone calls over the Internet, allowed **SIERP** and co-conspirators to use recognizable United States area codes to make it falsely appear on victims' caller identification devices that their calls were made from somewhere in the United States when, in fact, the calls originated in Costa Rica.

      g.     To induce victims to purchase Niyato stock, **ROBERT STENCIL, BROYLES, SIERP, LUDMILA STENCIL, LEWIS, FLEMING, DUKE, SACCOMANNO, SWERDLEN, DEARBORN,** and others made numerous false and fraudulent representations, both in direct exchanges with victims and through published and publicly posted materials.

5

These false and fraudulent representations included, among other things, that Niyato: had a headquarters in Charlotte, North Carolina, and at least one operational facility; had manufactured electric vehicles and sold 2,700 such vehicles; was an original equipment manufacturer of compressed natural gas (CNG) and liquid petroleum gas (LPG) vehicles and had been contracted to convert at least 150 such vehicles; possessed patented technology and proprietary hardware; held orders for hundreds of vehicles in production; was contracted to establish 5,000 CNG pumps across the United States; and employed as its Vice Chairman and Chief Operating Officer a former executive of Toyota Motor Corporation.

h.      To further induce victims to invest in Niyato stock, **ROBERT STENCIL**, **BROYLES, SIERP, LEWIS, FLEMING, DUKE, SACCOMANNO, SWERDLEN, DEARBORN**, and others falsely told victims that Niyato's stock was marketable, on the verge of an initial public offering (IPO), and would have a value of at least $5.00 per share after the IPO. **ROBERT STENCIL, BROYLES, SIERP, LEWIS, FLEMING, DUKE, SACCOMANNO, SWERDLEN, DEARBORN**, and others then falsely represented that victims had only a brief opportunity to purchase Niyato stock for $0.50 per share in a pre-public offering—thus promising a high-yield return on victims' investments.

i.      **ROBERT STENCIL, BROYLES, SIERP, LEWIS, FLEMING, DUKE, SACCOMANNO, SWERDLEN, DEARBORN**, and others also falsely represented to victims orally and in a Private Placement Memorandum they drafted and distributed to victims that Niyato would use 97.1 percent of invested funds as working capital for (i) administrative, salary and general expenses of the Company and (ii) the Company's advertising and promotion of its products.  Similarly, **ROBERT STENCIL, BROYLES, SIERP, LEWIS, FLEMING**,

6

DUKE, SACCOMANNO, SWERDLEN, DEARBORN, and others falsely represented to victims orally and through marketing materials that Niyato would use the majority of investor funds to expand existing production facilities, develop infrastructure, increase inventory, further operations, and prepare for an imminent stock IPO.

       j.     Once a victim agreed to purchase Niyato stock, **ROBERT STENCIL, BROYLES, SIERP, LEWIS, FLEMING, DUKE, SACCOMANNO, SWERDLEN, DEARBORN,** and others continued to contact the victim to persuade the victim to make additional purchases of Niyato stock to allegedly maximize the victim's investment gains. In truth and in fact, **ROBERT STENCIL, BROYLES, SIERP, LUDMILA STENCIL, LEWIS, FLEMING, DUKE, SACCOMANNO, SWERDLEN,** and **DEARBORN,** knew that the proceeds of Niyato stock sales were not invested in Niyato, but paid out to them and others for their personal benefit.

       k.     To obtain victims' money, **ROBERT STENCIL, BROYLES, SIERP, LUDMILA STENCIL, LEWIS, FLEMING, DUKE, SACCOMANNO, SWERDLEN, DEARBORN,** and others instructed victims to mail payments for Niyato stock to Niyato at the private mail box identified as Niyato's corporate address in Charlotte, North Carolina, or to wire payments directly into Niyato's J.P. Morgan Chase bank account, which **ROBERT STENCIL** and **LUDMILA STENCIL** controlled.

       l.     **ROBERT STENCIL** and **LUDMILA STENCIL** received and deposited into Niyato's bank account all victim payments mailed to the private mail box. **ROBERT STENCIL** and **LUDMILA STENCIL** also monitored Niyato's bank account for victim payments made by wire transfers directly into that account.

7

m.  Upon **ROBERT STENCIL** and **LUDMILA STENCIL**'s receipt of victim funds, **LUDMILA STENCIL**, in her represented capacity as Niyato's Corporate Secretary, would issue and send the victim a Niyato stock certificate that she had signed.

n.  Once a victim investor's funds were deposited into Niyato's bank account, **ROBERT STENCIL** and **LUDMILA STENCIL** distributed from that account by wire transfer a sales commission payment of approximately 50 percent of the victim's funds to the bank account(s) of the co-conspirator(s) who had contacted the victim and induced the victim to purchase Niyato stock. **ROBERT STENCIL** and **LUDMILA STENCIL** specifically directed wire transfers from the Niyato bank account to bank accounts controlled by **DUKE** and **BROYLES** in amounts equivalent to approximately 50 percent of the sums invested by victims whom **DUKE** and **BROYLES** solicited. Similarly, after receiving investments from victims whom **SIERP**, **FLEMING**, **SACCOMANNO**, **SWERDLEN** and **DEARBORN** solicited, **ROBERT STENCIL** and **LUDMILA STENCIL** wired approximately 40-45 percent of the invested funds to domestic bank accounts controlled by the respective defendants and approximately 5-10 percent of the invested funds to one of **BROYLES**'s bank accounts (as a result of the fact that **BROYLES** recruited the other defendants into the scheme). For victims solicited by **LEWIS**, **ROBERT STENCIL** and **LUDMILA STENCIL** wired approximately 45 percent of the invested funds to the domestic bank account controlled by **LEWIS** and approximately 5 percent of the invested funds to one of **BROYLES**'s bank accounts.

o.  After **ROBERT STENCIL** and **LUDMILA STENCIL** had transferred victim funds to **SIERP**'s domestic SunTrust bank account, **SIERP** would withdraw those funds in Costa Rica by means of cash ATM withdrawals.

8

p.      Of the remaining victim funds that they did not pay as sales commission to **BROYLES, SIERP, LEWIS, FLEMING, DUKE, SACCOMANNO, SWERDLEN, DEARBORN**, and other co-conspirators, **ROBERT STENCIL** and **LUDMILA STENCIL** spent the funds for their own personal benefit, either directly or by transferring the funds to their personal bank accounts.

15.      **ROBERT STENCIL, BROYLES, SIERP, LUDMILA STENCIL, LEWIS, FLEMING, DUKE, SACCOMANNO, SWERDLEN, DEARBORN**, and others used invested victim funds for their personal benefit, not to develop and operate Niyato as a viable business.

16.      **ROBERT STENCIL, BROYLES, SIERP, LUDMILA STENCIL, LEWIS, FLEMING, DUKE, SACCOMANNO SWERDLEN**, and **DEARBORN**, never initiated an IPO for Niyato stock.

17.      Through their actions, including their misuse of invested victim funds, **ROBERT STENCIL, BROYLES, SIERP, LUDMILA STENCIL, LEWIS, FLEMING, DUKE, SACCOMANNO, SWERDLEN, DEARBORN**, and others made Niyato and its stock worthless.

All in violation of Title 18, United States Code, Sections 1349 and 2326(2)(A) & (B).

9

## COUNTS TWO THROUGH FIFTEEN
### (MAIL FRAUD - 18 U.S.C. SECTION 1341)

18.   The Grand Jury realleges and incorporates by reference paragraphs 1 through 11 and 13 through 17 of this Indictment.

19.   From at least January 2012, the exact date being unknown to the Grand Jury, through on or about August 18, 2016, in Charlotte, Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendants

**ROBERT LESLIE STENCIL,
DANIEL THOMAS BROYLES, SR.,
KRISTIAN F. SIERP,
LUDMILA O. STENCIL,
MARTIN DELAINE LEWIS,
NICHOLAS FLEMING,
MICHAEL ALLEN DUKE,
PAULA SACCOMANNO,
DENNIS SWERDLEN,**
and
**SCOTT DEARBORN,**

together with others known and unknown to the Grand Jury, knowingly and willfully devised a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

<u>Purpose of the Scheme and Artifice</u>

20.   The Grand Jury realleges and incorporates by reference paragraph 13 of this Indictment as a description of the purpose of the scheme and artifice.

<u>The Scheme and Artifice</u>

21.   The Grand Jury realleges and incorporates by reference paragraph 14 of this Indictment as a description of the scheme and artifice.

10

<u>Use of the Mails</u>

22.    On or about the dates set forth below, each such date constituting a separate count

of the Indictment, in the Western District of North Carolina and elsewhere, the defendants,

**ROBERT LESLIE STENCIL,**
**DANIEL THOMAS BROYLES, SR.,**
**KRISTIAN F. SIERP,**
**LUDMILA O. STENCIL,**
**MARTIN DELAINE LEWIS,**
**NICHOLAS FLEMING,**
**MICHAEL ALLEN DUKE,**
**PAULA SACCOMANNO,**
**DENNIS SWERDLEN,**
and
**SCOTT DEARBORN**

together with others known and unknown to the Grand Jury, did knowingly and willfully place

and caused to be placed in a post office and authorized depository for mail matter, and to be sent

and delivered by the Postal Service and by a private and commercial interstate carrier, mail

matter, specifically victim investments in Niyato Industries, Inc., for the purpose of executing the

scheme to defraud, and attempting to do so:

| Count | Sender Initials | Mail Matter Sent From | Received | Approximate Date |
|---|---|---|---|---|
| 2 | LT | Newman Lake, WA | Charlotte, NC | 12/07/15 |
| 3 | EF | Golden, CO | Charlotte, NC | 2/25/2016 |
| 4 | TW | Williams, AZ | Charlotte, NC | 2/17/2016 |
| 5 | LF | Lafayette, CA | Charlotte, NC | 3/04/2016 |
| 6 | WH | Davenport, IA | Charlotte, NC | 4/05/2016 |
| 7 | RS, KS & JG | Bridgman, MI | Charlotte, NC | 4/22/2016 |
| 8 | PM | Phoenix, AZ | Charlotte, NC | 5/04/2016 |
| 9 | EF | Golden, CO | Charlotte, NC | 5/24/2016 |
| 10 | RK | McKinney, TX | Charlotte, NC | 5/25/2016 |
| 11 | RR | Truckee, CA | Charlotte, NC | 5/26/2016 |
| 12 | RB | La Center, KY | Charlotte, NC | 6/13/2016 |

11

| Count | Sender Initials | Mail Matter Sent From | Received | Approximate Date |
|---|---|---|---|---|
| 13 | EG | Peoria, IL | Charlotte, NC | 6/13/2016 |
| 14 | LF | Lafayette, CA | Charlotte, NC | 6/15/2016 |
| 15 | VM | Muscatine, IA | Charlotte, NC | 6/16/2016 |

All in violation of Title 18, United States Code, Sections 1341 and 2.

## COUNTS SIXTEEN THROUGH TWENTY-NINE
### (WIRE FRAUD - 18 U.S.C. SECTION 1343)

23.     The Grand Jury realleges and incorporates by reference paragraphs 1 through 11

and 13 through 17 of this Indictment.

24.     From at least January 2012, the exact date being unknown to the Grand Jury,

through on or about August 18, 2016, in Charlotte, Mecklenburg County, within the Western

District of North Carolina, and elsewhere, the defendants

**ROBERT LESLIE STENCIL,**
**DANIEL THOMAS BROYLES, SR.,**
**KRISTIAN F. SIERP,**
**LUDMILA O. STENCIL,**
**MARTIN DELAINE LEWIS,**
**NICHOLAS FLEMING,**
**MICHAEL ALLEN DUKE,**
**PAULA SACCOMANNO,**
**DENNIS SWERDLEN,**
and
**SCOTT DEARBORN**

together with others known and unknown to the grand jury, knowingly and willfully devised a

scheme and artifice to defraud and to obtain money and property by means of materially false

and fraudulent pretenses, representations, and promises.

### Purpose of the Scheme and Artifice

25.     The Grand Jury realleges and incorporates by reference paragraph 13 of this

Indictment as a description of the purpose of the scheme and artifice.

### The Scheme and Artifice

26.     The Grand Jury realleges and incorporates by reference paragraph 14 of this

Indictment as a description of the scheme and artifice.

### Use of the Wires

13

27.     On or about the dates set forth below, each such date constituting a separate count of the Indictment, in the Western District of North Carolina and elsewhere, the defendants,

**ROBERT LESLIE STENCIL,**
**DANIEL THOMAS BROYLES, SR.,**
**KRISTIAN F. SIERP,**
**LUDMILA O. STENCIL,**
**MARTIN DELAINE LEWIS,**
**NICHOLAS FLEMING,**
**MICHAEL ALLEN DUKE,**
**PAULA SACCOMANNO,**
**DENNIS SWERDLEN,**
and
**SCOTT DEARBORN,**

together with others known and unknown to the Grand Jury, did knowingly and willfully transmit, and cause to be transmitted, the following wire transfers in interstate commerce to and from the Niyato bank account or a co-conspirator's bank account for the purpose of receiving victim investor funds or for making commission payments for the inducement of victim investor funds, in furtherance of the scheme to defraud:

| Count | Sender | Recipient | Approximate Date | Approximate Amount |
|-------|--------|-----------|------------------|--------------------|
| 16 | Niyato | Swerdlen & Saccomanno | 12/18/2015 | $4,000 |
| 17 | Niyato | Fleming & Dearborn | 3/04/2016 | $2,250 |
| 18 | Niyato | Duke | 3/09/2016 | $12,500 |
| 19 | Niyato | Fleming & Dearborn | 4/12/2016 | $6,750 |
| 20 | Niyato | Sierp | 4/19/2016 | $10,000 |
| 21 | Niyato | Sierp | 4/26/2016 | $8,400 |
| 22 | Niyato | Swerdlen & Saccomanno | 4/26/2016 | $2,000 |
| 23 | Niyato | Sierp | 5/2/2016 | $4,000 |
| 24 | Niyato | Swerdlen & Saccomanno | 5/31/2016 | $10,000 |

14

| Count | Sender | Recipient | Approximate Date | Approximate Amount |
|-------|--------|-----------|------------------|--------------------|
| 25 | Niyato | Fleming | 6/01/2016 | $2,250 |
| 26 | DD | Niyato | 6/20/2016 | $8,000 |
| 27 | Niyato | Lewis | 6/21/2016 | $3,200 |
| 28 | Niyato | Broyles | 6/21/2016 | $12,500 |
| 29 | Niyato | Broyles | 6/22/2016 | $12,500 |

All in violation of Title 18, United States Code, Sections 1343 and 2.

15

## COUNTS THIRTY THROUGH THIRTY-FOUR
## (MONEY LAUNDERING – MONETARY TRANSACTION - 18 U.S.C. Section 1957(a))

28.    The Grand Jury realleges and incorporates by reference paragraphs 1 through 4, 6, and 8 of this Indictment.

29.    On or about the dates set forth below, each such date constituting a separate count of the Indictment, in the Western District of North Carolina and elsewhere, the defendants,

**ROBERT LESLIE STENCIL,**
**DANIEL THOMAS BROYLES, SR.,**
**LUDMILA O. STENCIL,**
**MARTIN DELAINE LEWIS,**
and
**MICHAEL ALLEN DUKE,**

together with others known and unknown to the Grand Jury, did knowingly engage and attempt to engage in the following monetary transactions by, through, or to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, that is the transfer of funds from Niyato's bank account to **BROYLES**'s Bank of America account with account number ending #2110, to **DUKE**'s JPMC account with account number ending #1835, and to **LEWIS**'s Frost Bank account with account number ending #7319, such property having been derived from a specified unlawful activity, namely mail and wire fraud in violation of Title 18, United States Code, Sections 1341 and 1343:

| Count | Sender | Recipient | Date | Amount |
|-------|--------|-----------|------|--------|
| 30 | Niyato | Broyles | 3/01/2016 | $11,000 |
| 31 | Niyato | Broyles | 4/26/2016 | $12,500 |
| 32 | Niyato | Duke | 3/01/2016 | $34,000 |
| 33 | Niyato | Duke | 5/09/2016 | $12,500 |
| 34 | Niyato | Lewis | 6/01/2016 | $14,000 |

All in violation of Title 18, United States Code, Sections 1957(a) and 2.

16

## COUNTS THIRTY-FIVE THROUGH THIRTY-EIGHT
## (MONEY LAUNDERING – INTERNATIONAL - 18 U.S.C. Section 1956(a)(2)(A))

29.    The Grand Jury realleges and incorporates by reference paragraphs 1 through 11 and 13 through 17 of this Indictment.

30.    On or about the respective dates set forth below, each such date constituting a separate count of this Indictment, within the Western District of North Carolina and elsewhere, the defendant

### KRISTIAN F. SIERP,

together with others known and unknown to the Grand Jury, did knowingly transport, transmit, and transfer, and cause to be transported, transmitted, and transferred, monetary instruments and funds from and through a place in the United States to a place outside of the United States, that is the ATM withdrawal of funds in Costa Rica from his domestic SunTrust bank account, with the intent to promote the carrying on of specified unlawful activity, namely mail and wire fraud in violation of Title 18, United States Code, Sections 1341 and 1343:

| Count | Receiver | Transfer Sent From | ATM Transfer Received | Date | Amount |
|-------|----------|--------------------|-----------------------|------|--------|
| 35 | Sierp | Atlanta, GA | Costa Rica | 5/09/2016 | $503.76 |
| 36 | Sierp | Atlanta, GA | Costa Rica | 5/11/2016 | $503.75 |
| 37 | Sierp | Atlanta, GA | Costa Rica | 5/13/2016 | $503.68 |
| 38 | Sierp | Atlanta, GA | Costa Rica | 5/16/2016 | $504.75 |

All in violation of Title 18, United States Code, Sections 1956(a)(2)(A) & (i)(1)(B).

17

## NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

Notice is hereby given of 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). Under Section 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by Section 981(a)(1)(C). The following property is subject to forfeiture in accordance with Section 982 and/or 2461(c):

    a.    All property which constitutes or is derived from proceeds of the violations set forth in this Indictment;

    b.    All property involved in such violations or traceable to property involved in such violations; and

    c.    If, as set forth in 21 U.S.C. § 853(p), any property described in (a) or (b) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendants to the extent of the value of the property described in (a) and (b).

The Grand Jury finds probable cause to believe that the following property is subject to forfeiture on one or more of the grounds stated above:

- A forfeiture money judgment in the amount of at least $2,597,910, such amount constituting the proceeds of the violations set forth in this Indictment;

18

- Approximately $40,672.71 in funds seized during the investigation from SunTrust Account XXXXXXXXX9740 and Account XXXXXXXXX8252, such accounts held by or for the benefit of Kristian F. Sierp;

- Approximately $305,096.58 seized during the investigation from J.P. Morgan Chase Account XXXXX9352 and Account XXXXXX6166, such accounts held by or for the benefit of Niyato Industries, Inc. and/or Robert Leslie Stencil;

- Approximately $100,000 seized from a law firm to which Niyato Industries, Inc. had forwarded fraud proceeds;

- One 2012 Ford LGT Conventional F-150, VIN 1FTNF1CFXCKD28495, seized as evidence in this matter; and

- One 2015 Ford F-350, VIN 1FT8W3B63FEB06250, seized as evidence in this matter.

A TRUE BILL

JILL WESTMORELAND ROSE,
UNITED STATES ATTORNEY

SANDRA MOSER
ACTING CHIEF, FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

WILLIAM H. BOWNE
William.Bowne2@usdoj.gov
CHRISTOPHER FENTON
christopher.fenton@usdoj.gov
Trial Attorneys
Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Avenue, NW
Washington, D.C. 20005
(202) 514-0660

19

# Exhibit B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: ) | UNDER SEAL |
| ) | |
| INFORMATION ASSOCIATED WITH ) | CASE NO. _3:16mj 271_ |
| YAHOO!, INC. E-MAIL ACCOUNTS ) | |
| KSIERP@YAHOO.COM AND ) | |
| DUSTINE777@YAHOO.COM, AS ) | |
| IDENTIFIED AT ATTACHMENT A-1 ) | |
| ) | |
| INFORMATION ASSOCIATED WITH ) | CASE NO. _3:16mj 270_ |
| GOOGLE, INC. E-MAIL ACCOUNTS ) | |
| DANBROYLES3@GMAIL.COM, ) | |
| KFS528@GMAIL.COM, AND ) | |
| PDAVID629@GMAIL.COM, AS ) | |
| IDENTIFIED AT ATTACHMENT A-2 ) | |
| ) | CASE NO. _3:16mj 269_ |
| INFORMATION ASSOCIATED WITH ) | |
| MICROSOFT CORP. E-MAIL ACCOUNTS ) | |
| GABO.C1977@HOTMAIL.COM AND ) | |
| MUROLOMARCO@HOTMAIL.COM, AS ) | |
| IDENTIFIED AT ATTACHMENT A-3 ) | |

## AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANTS

I, Mark A. Heath, being first duly sworn state the following:

## INTRODUCTION

1.     This affidavit is made in support of applications for search and seizure warrants to

obtain information associated with the following e-mail accounts (the TARGET E-MAIL

ACCOUNTS):

       a.  ksierp@yahoo.com (TARGET E-MAIL ACCOUNT 1);

       b.  danbroyles3@gmail.com (TARGET E-MAIL ACCOUNT 2);

       c.  kfs528@gmail.com (TARGET E-MAIL ACCOUNT 3);

       d.  pdavid629@gmail.com (TARGET E-MAIL ACCOUNT 4);

       e.  murolomarco@hotmail.com (TARGET E-MAIL ACCOUNT 5):

1

f.  gabo.c1977@hotmail.com (TARGET E-MAIL ACCOUNT 6); and

g.  dustine777@yahoo.com (TARGET E-MAIL ACCOUNT 7).

2.    TARGET E-MAIL ACCOUNTS 1 and 7 are stored at premised controlled by: Yahoo!, Inc. (YAHOO), an e-mail provider headquartered at 701 First Avenue, Sunnyvale, California 94089, as described in Attachment A-1.

3.    TARGET E-MAIL ACCOUNTS 2, 3, and 4 are stored at premises controlled by Google, Inc. (GOOGLE), an e-mail provider headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043, as described in Attachment A-2.

4.    TARGET E-MAIL ACCOUNTS 5 and 6 are stored at premises controlled by Microsoft Corp. (MICROSOFT), an e-mail provider headquartered at One Microsoft Way, Redmond, WA 98052, as described in Attachment A-3.

5.    This affidavit is made in support of applications for search and seizure warrants under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require YAHOO, GOOGLE, and MICROSOFT (together, the TARGET E-MAIL PROVIDERS) to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

6.    Based on the facts set forth in this affidavit, there is probable cause to believe that the users of TARGET E-MAIL ACOUNTS 1-7 are engaged in, or associated with, a fraudulent investment scheme in violation of Title 18 United States Code (U.S.C.) § 1341 (mail fraud) and/or 18 U.S.C. § 1343 (wire fraud). There is also probable cause to search information (including communications) associated with each of the TARGET E-MAIL

2

ACCOUNTS, as described in Attachments A-1, A-2, and A-3, for evidence, fruits, and/or instrumentalities of those crimes, as further described in Attachment B.

## AFFIANT'S BACKGROUND

7.      I am a Postal Inspector employed by the U.S. Postal Inspection Service. I have been a Postal Inspector since August 2001. As part of my current duties, I investigate instances of fraud including, but not limited to, those involving the use of the United States Postal Service. I received my basic training as a criminal investigator at the U.S. Postal Service Academy in Potomac, Maryland. Over the years, I have received training in the areas of financial fraud, computer forensics, and white collar crime. I have been the case agent in numerous criminal investigations. I have authorized and sworn to numerous affidavits in support of federal search warrants, federal arrest warrants, and federal warrants for seizure of property subject to forfeiture. I have personally participated in executing search warrants and seizing evidence, including computers and other electronic equipment, from both businesses and personal residences. As a Postal Inspector, I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations and to make arrests for federal felony violations.

8.      The facts set forth in this affidavit are based upon my personal knowledge and knowledge obtained during my participation in this investigation, including my review of documents related to this investigation, communication with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. This affidavit does not contain all of the information known to me regarding this investigation. I have included in this affidavit facts that I

believe are sufficient to support a probable cause finding for the issuance of the requested warrant, but I do not purport to include each and every fact observed or known to me or other law enforcement agents involved in this investigation.

## JURISDICTION

9.     The Court has jurisdiction to issue the requested warrants because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. *See* 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

10.     I am familiar with the Indictment, attached hereto as Exhibit A, wherein Kristian F. SIERP was charged for his role in a wire and mail fraud scheme. As set forth in that Indictment, SIERP engaged in a fraudulent sweepstakes telemarketing call center conspiracy in Costa Rica from approximately January 2010 through the time of his arrest on June 16, 2016. In particular, SIERP owned, managed, and worked in one or more fraudulent sweepstakes telemarketing call centers in Costa Rica. As part of the scheme perpetrated by the call centers, SIERP and his co-conspirators falsely told victims, via the use calls facilitated by voice over Internet protocol technology, that the victims had won large cash prizes but that, in order to collect the prizes, the victims had to send a sum of money to the perpetrators of the scheme as a "fee," "duty," "tax," or for "insurance." The Indictment contains a Notice of Forfeiture in the amount of $10,000,000, which constitutes the gross proceeds of the violations set forth in the Indictment.

4

11.     On June 16, 2016, law enforcement agents arrested SIERP in Fort Lauderdale, Florida, on the charges stated in the Indictment. SIERP had arrived in Fort Lauderdale from Costa Rica.

12.     At the time of his arrest, law enforcement agents seized from SIERP an Apple iPhone model A1533 telephone, among other electronic devices. SIERP consented to the search of the Apple iPhone by signing an Inspection Service Form 8193, Consent to Search.

13.     Following SIERP's arrest on June 16, 2016, I learned that SIERP's personal bank account at SunTrust had received Automated Clearing House ("ACH") deposits from a business entity named Niyato Industries. Specifically, I identified three ACH deposits from Niyato's Chase Bank account to SIERP's SunTrust account between April 1, 2016, and June 23, 2016, totaling approximately $44,000. The Chase ACH deposits from Niyato largely represented the only deposits made into SIERP's account.

14.     According to North Carolina Secretary of State filings, Niyato Industries, LLC is a North Carolina-based company incorporated in 2010 by an individual identified herein as L.S. using the principal office address of 1235-E East Boulevard, Suite 130, Charlotte, North Carolina. According to Niyato's website, social media accounts, and its numerous press releases available on the Internet, Niyato purports to be a company with a production facility in the Charlotte, North Carolina area that uses a "Tri-Fuel System" to convert automobiles to operate on gasoline, natural gas, and propane.

15.     On June 17, 2016, I visited 1235-E East Boulevard, Charlotte, North Carolina. That location is actually occupied by Dilworth Packing Company, a Commercial Mail Receiving Agency ("CMRA"). At the Dilworth Packing Company, Private Mailbox ("PMB") #130 is registered to L.S. On the particular day that I visited, PMB #130

5

contained a large amount of mail and common courier shipments addressed to Niyato Industries and L.S.

16.　　On June 23, 2016, I contacted G.G. A FedEx parcel from G.G. and his wife, E.G., had been in PMB #130 on June 17, 2016. G.G. told me that he was an investor in Niyato Industries and had mailed $40,000 to Niyato during the month of June 2016. G.G. stated that he was buying stock in the company at .50 cents per share. G.G. said the salesman who convinced him via telephone and email to buy the stock told him that Niyato Industries planned to go public later in 2016, at which time the shares would be worth $5 to $6 per share. G.G. identified the salesman who induced him to purchase Niyato stock as Dan BROYLES. E.G. then forwarded to me a June 1, 2016 email that G.G. had received from BROYLES. The email is sent from TARGET E-MAIL ACCOUNT 2 and contains instructions for sending money to PMB #130 for the purchase of Niyato stock. The email also includes an attached Word document entitled "Niyato Subscription Agreement (2)(3)(6)." The agreement is an abbreviated version of a standard stock subscription form available via the Internet. The agreement's document properties indicate that BROYLES created it on January 11, 2016. A redacted version of the June 1, 2016 email from BROYLES to G.G., along with the subscription agreement that accompanied the email, are attached to this affidavit at Exhibit C.

17.　　On June 23, 2016, I contacted V.M. A FedEx parcel from V.M. had been in PMB #130 on June 17, 2016. V.M. told me that he has invested $80,000 in Niyato Industries to purchase preferred stocks in the company at .50 cents per share. V.M. was told by the salesman who convinced him via telephone and email to buy the stock that Niyato Industries was going to become a publicly traded company within the next several months,

6

at which time V.M.'s stocks were expected to be valued at $5 to $6 per share. V.M. stated that the agent who convinced him to invest in Niyato Industries was an individual identified herein as D.S. A records search shows D.S. is a resident of Boca Raton, Florida.

18.     Contrary to its website and presentation material given to investors, Niyato does not have a physical presence at any office or manufacturing facility that I have been able to identify. Investors G.G. and V.M., however, were both led to believe that they were mailing their investment checks directly to the physical offices of Niyato Industries, not a mailing facility.

19.     In the course of further investigating Niyato and SIERP, I learned that the promises of high-yield returns being made to customers investing in Niyato were similar those that SIERP previously offered to customers as part of a fraudulent scheme punished by the Financial Industry Regulatory Agency ("FINRA"). Specifically, according to publicly available sources, FINRA barred SIERP in 2005 from acting as a broker or otherwise associating with firms that sell securities to the public. According to the FINRA report announcing SIERP's bar, attached hereto as Exhibit B, SIERP engaged in deceptive and fraudulent sales practices while employed at Florida Discount Securities in Boca Raton, Florida. Namely, the report states that SIERP "employed deceptive, fraudulent, and manipulative devices" to sell "the common stock of two highly speculative [over-the-counter] securities," including through "an aggressive cold-calling campaign that involved, among other things, high-pressure sales tactics, misrepresentations," and "baseless performance and prices predictions" that were "designed to induce unsuspecting customers to purchase and hold the securities." FINRA reported that SIERP's scheme resulted in the loss of $3.5 million to his victims.

7

20. On June 27, 2016, this Court issued, and I served, a Seizure Warrant on SunTrust Bank for funds that SunTrust was holding in accounts belonging to SIERP. On June 29, 2016, I took possession of two cashier's check totaling $40,672.71 from SunTrust. Further, I continued to investigate the Niyato scheme and transactions from Niyato at Chase Bank to SIERP and SunTrust.

21. On July 7, 2016, I reviewed hundreds of images extracted from SIERP's Apple iPhone. Among other items, I identified the following three images saved in sequential order on SIERP's phone:

- An image of a document entitled, "Client Information." The document contains fields labelled "shares," "price," "net worth," "portfolio value" and "notes/traders."

- An image of a posting on a board in which the posting contains the phrase, "Please make checks payable to Niyato Industries Inc, 1235 E. East Blvd., Charlotte, NC." The posting also includes a Chase Bank account number and routing number.

- An image of a white board within a room. Handwritten names and corresponding dollar values are handwritten in marker. The whiteboard bears the header of "Niyato IPO (load)."

22. My review of SIERP's Apple iPhone also revealed a number of emails between SIERP and BROYLES. I identified several of those emails as pertaining to Niyato or, based on my training and experience, as otherwise related to a telemarking and/or high-yield investment fraud scheme. For example:

a. On February 24, 2016, BROYLES using TARGET E-MAIL ACCOUNT 2 sent SIERP an email at TARGET E-MAIL ACCOUNT 1 entitled "scripts." That email contains a Word document attachment entitled "Niyato CALL BACK." The Word document contains a lengthy script for a telephone caller to read to prospective investors in Niyato. Among other things (and without formatting emphases), the script states that

8

Niyato is "becoming a leader in the U.S. for natural gas powered vehicles, and fueling stations across the country," and that Niyato has "top management in the industry that will assure their success." The script further states that Niyato is "only selling a limited amount of [stock] shares, . . . but the good news is, you can still get in if you want." The script then promises a public offering of Niyato stock "coming out at a minimum of $5 per share," but then pledges to "offer it to you now at only $.50 cents per share!" "The Founder has made it clear," the script says, "that this is a short window, and that they will use these funds primarily for the promotion of the company to all the brokerage firms across the country that will be pushing the stock once we go public." The script then encourages the taking of a $25,000 "subscription" for Niyato stock. The February 24, 2016 email from BROYLES to SIERP and the attached script are included with this affidavit as Exhibit D.

Based on my training and experience, I recognize the script sent from BROYLES to SIERP as being consistent with those used in telemarketing and high-yield investment schemes to induce individuals to send money to those furthering or associated with the schemes. Furthermore, I know based on my training and experience that it is common for co-conspirators engaged in a telemarketing and/or high-yield investment scheme to use a shared script to ensure delivery of a consistent message to prospective victims.

b.      On February 25, 2016, BROYLES sent another email using TARGET E-MAIL ACCOUNT 2 to SIERP at TARGET E-MAIL ACCOUNT 1. The email consists only of a subject line stating: "no call states NC & NV." Based on my training and experience, I believe that BROYLES is instructing SIERP not to call individuals residing in North Carolina or Nevada to pitch them on the sale of Niyato stock subscriptions.

9

c.   On April 8, 2016, BROYLES sent a further email using TARGET E-MAIL ACCOUNT 2 to SIERP at TARGET E-MAIL ACCOUNT 1 noting the supposed hiring of a Niyato executive named "Kathi Hanley" as the "Chief Operating Officer and Director/Vice Chairman of Niyato Industries." This note is similar to the call-back script's reference to an alleged "Kathy Hanley" working as Niyato's "COO"; it also is consistent with certain press releases published online by individuals or entities associated with Niyato.

d.   On June 7, 2016, SIERP sent an email using TARGET E-MAIL ACCOUNT 1 to BROYLES at TARGET E-MAIL ACCOUNT 2 with the subject line "$$$" and the message "When do I get paid on [Last Name 1] and [Last Name 2]?" Based on my training and experience, as well as my knowledge of how individuals engaged in telemarketing fraud schemes obtain commission-like payments for their successful efforts, I believe that SIERP in this email is seeking payment for efforts to induce the named individuals to purchase subscriptions for Niyato stock.

23.   My review of SIERP's Apple iPhone also revealed a number of emails in which SIERP, using TARGET E-MAIL ACCOUNTS 1 or 3, forwarded the Niyato call-back script (attached hereto as Exhibit D) to other individuals at TARGET E-MAIL ACCOUNTS 4-7. Specifically,

- On March 9, 2016, SIERP used TARGET E-MAIL ACCOUNT 1 to send the Niyato call-back script in an email entitled "script" to an individual associated with TARGET E-MAIL ACCOUNT 7.

- On April 12, 2016, SIERP used TARGET E-MAIL ACCOUNT 1 to send the Niyato call-back script in an email entitled "script" to an individual associated with TARGET E-MAIL ACCOUNT 4.

10

- On April 15, 2016, SIERP used TARGET E-MAIL ACCOUNT 1 to send the Niyato call-back script in an email entitled "script" to an individual associated with TARGET E-MAIL ACCOUNT 6.

- On April 28, 2016, SIERP used TARGET E-MAIL ACCOUNT 1 to send the Niyato call-back script in an email entitled "script" to an individual associated with TARGET E-MAIL ACCOUNT 5.

- On April 28, 2016, SIERP also used TARGET E-MAIL ACCOUNT 3 to send a follow-up email to the individual associated with TARGET E-MAIL ACCOUNT 5. The email has a subject line "NIYATO" and contains the following punctuationless message: "Hey bro I hope you got all the emails that I sent you it was a lot but read over all that info and learn the product I'll do the rest whenever you're interested let me know and will get working on everything that you would possibly need to research and know the company including all the pitches and Scripps and all that good stuff. . . Make sure you send me an email back that you got all of it OK."

Based on my training and experience, as well as SIERP's status as an owner and manager of a telemarketing call center in Costa Rica, I believe that these emails represent SIERP forwarding the Niyato call-back script to individuals that he had recruited, or was recruiting, to assist in the pitch of Niyato stock subscriptions.

24.     My review of SIERP's Apple iPhone also revealed text and voice messages between SIERP and an individual identified herein as B.S. The messages were dated April 23, 2016, through May 23, 2016. In the messages, B.S. states that he is in a "bad spot financially" and needs to earn money quickly. In replying messages, SIERP and B.S. outline a scenario in which B.S. and a friend could travel to Costa Rica and be "making five to ten thousand dollars a week as soon as you [B.S.] learn the front." SIERP describes himself as the closer and states that he will email the pitches so that B.S. can become familiar with the wording for the "opener" and the "closer" before he starts making calls on the following Monday.

25. On July 8, 2016, I reviewed records for Niyato Industries' Chase account number XXXXX9352 for the time period of April 1, 2016, through June 30, 2016. During that time period, the Chase account received $691,719.77 in total deposits. Withdrawals for the same period totaled $598,307.13. The withdrawals largely consisted of ACH transfers to SIERP, BROYLES, the individual identified by investor V.M. as the salesman who sold him Niyato stock, and other individuals associated with Niyato in certain documents. Other withdrawals from the account appear to be personal expenses at locations such as Taco Bell, Rite Aid Pharmacy, Harris Teeter, Cabela's and Victoria's Secret. I was able to identify only $14,856 in expenses paid from Niyato's Chase account over the three-month period that could be related to the automotive industry (Niyato's asserted area of operation). I was unable to identify any expenses paid to brokerage firms (the purpose for which the sales script in SIERP's email account alleged that the "funds primarily" would be used).

26. On July 8, 2016, Judge Cayer issued, and I served, a Seizure Warrant on Chase Bank for funds that Chase was holding in accounts belonging to Niyato. On July 11, 2016, Chase confirmed that it had seized $305,096.58 from Niyato's accounts for transfer to the government's possession.

27. Based on the aforementioned facts, including (1) SIERP's Indictment for fraud, (2) SIERP's past fraudulent misconduct documented by FINRA, (3) the absence of facilities or operations by Niyato, despite contrary public assertions, (4) the circumstances of G.G.'s and V.M.'s investments in Niyato, (5) the ACH deposits from Niyato's Chase account into one or more accounts controlled by SIERP and those identified as salesmen by G.G. and V.M., (6) the photos, emails, and conversations recovered from SIERP's

12

phone that are indicative of fraudulent telemarketing linked to the sale of Niyato stock, and (7) my knowledge from investigating past telemarketing schemes, I submit that there is probable cause to believe that SIERP, BROYLES, and their co-conspirators are engaging in a fraudulent telemarketing scheme to sell victims Niyato stock subscriptions based on false representations and pretenses in violation of 18 U.S.C. § 1341 and 18 U.S.C § 1343. I further submit that there is probable cause to believe that information associated SIERP's, BROYLES's, and their co-conspirators' TARGET E-MAIL ACCOUNTS, as described in Attachments A-1, A-2, and A-3, constitutes evidence, fruits, and/or instrumentalities of their crimes that justifies the issuance of this warrant to allow examination of that information as part of an ongoing investigation in a manner consistent with the Fourth Amendment and other laws.

### BACKGROUND CONCERNING E-MAIL

28.    In my training and experience, I have learned that the TARGET E-MAIL PROVIDERS offer a variety of services, including e-mail access and electronic data storage, to the public. The TARGET E-MAIL PROVIDERS allow subscribers to obtain e-mail accounts using various domain names (*e.g.*, hotmail.com, gmail.com, me.com), including those e-mail accounts listed in Attachments A-1, A-2, and A-3. Subscribers obtain an e-mail account by registering for free e-mail services offered by the TARGET E-MAIL PROVIDERS. During the registration process, the TARGET E-MAIL PROVIDERS ask subscribers to provide basic personal information. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including a credit- or bank-account number). The computers of the TARGET

13

E-MAIL PROVIDERS are likely to contain stored electronic communications (including retrieved and unretrieved e-mails for subscribers) and information concerning subscribers and their use of e-mail services, such as account access information, e-mail transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user(s).

29. Subscribers of the TARGET E-MAIL PROVIDERS can also store with the providers files in addition to e-mails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to e-mails), draft messages, deleted items, and other files, on servers maintained and/or owned by the TARGET E-MAIL PROVIDERS. In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, draft e-mail messages, deleted messages, e-mail in the account, and attachments to e-mails, including pictures and files.

30. In my training and experience, the TARGET E-MAIL PROVIDERS typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, the TARGET E-MAIL PROVIDERS often have records of the Internet Protocol address (IP address) used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP

14

address information can help to identify which computers or other devices were used to access the e-mail account.

31.    In my training and experience, in some cases, e-mail account users will communicate directly with a TARGET E-MAIL PROVIDER about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. The TARGET E-MAIL PROVIDERS typically retain records about such communications, including records of contacts between a user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

## CONCLUSION

32.    Based on the foregoing information, I respectfully request that the Court issue the proposed search warrant. Because the warrant will be served on the TARGET E-MAIL PROVIDERS, which will then compile the requested records at a time convenient to them, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

I declare under penalty of perjury that the foregoing is true and correct.

Mark A. Heath, U.S. Postal Inspector
United States Postal Inspection Service

Sworn and subscribed to before me on this fourteenth day of July 2016.

Hon. David C. Keesler
United States Magistrate Judge

15

## ATTACHMENT A-1
## PLACE TO BE SEARCHED

The place to be searched is Yahoo!, Inc., an e-mail provider headquartered at 701 First Avenue, Sunnyvale, California 94089, for all information associated with the following e-mail accounts:

ksierp@yahoo.com
dustine777@yahoo.com

## ATTACHMENT A-2
## PLACE TO BE SEARCHED

The place to be searched is Google, Inc., an e-mail provider headquartered at 1600

Amphitheatre Parkway, Mountain View, CA 94043, for all information associated with the

following e-mail accounts:

danbroyles3@gmail.com
kfs528@gmail.com
pdavid629@gmail.com

## ATTACHMENT A-3
## PLACE TO BE SEARCHED

The place to be searched is Microsoft Corporation, an e-mail provider, headquartered at One Microsoft Way, Redmond, WA 98052, for all information associated with the following e-mail accounts:

murolomarco@hotmail.com
gabo.c1977@hotmail.com

## ATTACHMENT B
## PARTICULAR ITEMS TO BE SEIZED

I.     **Information to be disclosed by Yahoo!, Inc., Google, Inc., and Microsoft Corp.:**

To the extent that the information described in Attachments A-1, A-2, and A-3 is within the possession, custody, or control of Yahoo!, Inc., Google, Inc., and Microsoft Corp. (each a TARGET E-MAIL PROVIDER), including any e-mails, records, files, logs, or information that has been deleted but is still available to the TARGET E-MAIL PROVIDER, or has been preserved pursuant to requests made under 18 U.S.C. § 2703(f) on July 9, 2016, and July 11, 2016, and any other dates, the TARGET E-MAIL PROVIDER is required to disclose the following information to the government for each e-mail account listed in in Attachments A-1, A-2, and A-3:

a.     The contents of all e-mails, chat messages, instant messages, text messages, and voice messages associated with the account, including stored or preserved copies of e-mails and messages sent to and from the accounts, draft e-mails and messages, chat messages, the source and destination addresses associated with each e-mail or message, the date and time at which each e-mail or message was sent, and the size and length of each e-mail or message;

b.     All records or other information regarding the identification of the account holder or user(s), to include any full name(s), physical address(es), telephone number(s), alternative e-mail address(es), means and source of payment (including any credit- or bank-account number), and other identifiers.

c.     All records of account-access session times and durations, the date on which the account was created, the length of service, the IP address used to register the account,

- 1 -

log-in IP addresses associated with session times and dates, account status, methods of connecting, and log files;

      d.      The types of services utilized;

      e.      All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files; and

      f.      All records pertaining to communications between a TARGET E-MAIL PROVIDER and any person regarding the account, including contacts with support services and records of actions taken.

**II.    Information to be seized by the government:**

All information described above in Section I that constitutes evidence or instrumentalities of violations of 18 U.S.C. § 1341 (mail fraud) and/or 18 U.S.C. § 1343 (wire fraud), those violations involving Kristian F. SIERP, Dan BROYLES, and other individuals, including, for each e-mail account listed in Attachments A-1, A-2, and A-3, information pertaining to the following matters:

      a.      Records relating to Niyato Industries, or the mailing address 1235-E East Boulevard, Charlotte, North Carolina;

      b.      Records relating to telemarketing, investment, or stock brokerage activity, including records concerning:

          i.      the acquisition, identification, or sharing of personal identifying information, including but not limited to names, social security numbers, dates of birth, driver's license information, addresses, telephone numbers, e-mail addresses, employment

information, financial account records, and credit reports, related to individuals identified for potential solicitation;

  ii.     the pitches, scripts, sale messages, promotional materials, or payment instructions devised for, or presented to, individuals for the purpose of inducing individuals to send money or other things of value for the purchase of stock or other securities, or the payment of a fee, fine, insurance cost, tax, or duty;

  iii.     the use of voice over Internet protocol technology;

  iv.     the establishment or operation of a call center, from which individuals are contacted for the purpose of inducing individuals to send money or other things of value for the purchase of stock or other securities, or the payment of a fee, fine, insurance cost, tax, or duty; and

  v.     the contacting by phone, Internet, mail, or other means of individuals for the purpose of inducing individuals to send money or other things of value for the purchase of stock or other securities, or the payment of a fee, fine, insurance cost, tax, or duty;

  c.     Information relating to who created, used, or communicated with created voice over Internet protocol or other communication accounts, including records about their identities and whereabouts;

  d.     Banking and financial records, including, but not limited to, records reflecting the location and account information for bank accounts associated with Niyato Industries, SIERP, BROYLES, or the receipt of funds from individuals induced to send money or other things of value for the purchase of stock or other securities, or the payment of a fee, fine, insurance cost, tax, or duty;

- 3 -

e.  Records relating to the receipt, transfer, or other disposition of any criminal proceeds;

f.  Records and information relating to the identity and/or location of suspects and co-conspirators;

g.  Evidence indicating how and when the e-mail account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the e-mail account user;

h.  Evidence indicating the e-mail account user's state of mind as it relates to the crimes under investigation;

i.  Information relating to who created or used the e-mail account, including records that help reveal the whereabouts of such person(s);

j.  Records relating to the receipt, transfer, or other disposition of any criminal proceeds, including bank statements;

k.  The identity or location of any suspect or co-conspirator;

l.  Banking and financial records, including, but not limited to, documents in the form of receipts, checks, money orders, cashier's checks, statements and other bank records, letters of credit, credit-card statements, passbooks, cancelled checks, certificates of deposit, loan records, customer account information, income and expense summaries, cash disbursement journals, financial statements, state and federal income tax documents, wire transfers, bank deposits/withdrawals/transfers, general ledgers, disbursement records and/or journals, cash disbursement journals, and documents pertaining to the fraudulent transmission of funds across national and international boundaries;

- 4 -

m.    Any decryption key or password that could be used to conceal evidence relating to the crimes under investigation;

n.    The identity and whereabouts of the person(s) who communicated with the e-mail account about matters relating to the commission of the violations described in the affidavit.

o.    Any and all items and/or records associated with any goods, services, or property purchased from a bank or other financial account associated with Niyato Industries. SIERP, BROYLES, or to the commission of the violations described in the affidavit; and

p.    Any and all travel documents including but not limited to, passports (foreign or domestic), travel itineraries, airline tickets, hotel receipts, and car rentals.